David J. Jordan (1751)
David J. Williams (9186)
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation; LDS FAMILY SERVICES<br><br>               Plaintiffs<br><br>   v.<br><br>RJ and MM, individuals<br><br>               Defendants. | **MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**<br><br>Civil No.<br><br>The Honorable |

## STATEMENT OF RELIEF SOUGHT AND GROUNDS THEREFOR

Defendants RJ and MM have filed claims against these Plaintiffs in the Navajo Nation

District Court seeking damages for alleged acts of child abuse occurring while they were living

with nonmember host families in Utah cities and towns outside the Navajo reservation. Pursuant

to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for a temporary

restraining order and a preliminary injunction precluding Defendants from proceeding with their

claims in Navajo Tribal Court.

This Motion is made on the following grounds:

1. The Navajo Tribal Court lacks subject matter jurisdiction over Plaintiffs because none of the alleged conduct took place on the Navajo reservation;

2. Plaintiffs will suffer irreparable harm if forced to litigate in the Navajo Tribal Court;

3. The balance of harms supports enjoining the proceedings in the Navajo Tribal Court; and

4. The public interest will not be harmed by enjoining the Navajo Tribal Court proceeding.

## I.   <u>INTRODUCTION</u>

United States Supreme Court precedent recognizes that Indian tribes may exercise civil subject-matter jurisdiction over nonmembers in limited circumstances "'where tribes possess authority to regulate the activities of nonmembers,…'" *Nevada v. Hicks,* 533 US 353, 358 n.2 (2001) (quoting *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997).)  That said, the Supreme Court has never decided a case in which a tribal court was found to have jurisdiction over a nonmember, even for activities within reservation boundaries.  *See id. See also Montana v. United States*, 450 U.S. 544 (1981); *Strate,* 520 U.S. 438.  What is more, the Supreme Court has never suggested that a tribal court could exercise jurisdiction over the off-reservation activities of a nonmember.  Indeed, the Court has emphasized that tribal sovereignty stems from the tribes' right to control their land and does not extend beyond reservation boundaries.  *See*, *e.g.*, *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328-332, 128 S.Ct. 2709, 2719-20 (2008).

Here, Defendants RJ and MM have filed claims against these Plaintiffs in the Navajo

Nation District Court (the "Tribal Court") seeking damages for alleged acts of child abuse

occurring while they were living with nonmember host families in Utah cities and towns outside

the Navajo reservation.  These claims far exceed the well-established jurisdictional limits of

tribal courts.  Simply put, because Doe Defendants' claims involve nonmember activity outside

the reservation, the Tribal Court has no jurisdiction.  As such, Plaintiffs seek injunctive relief

precluding Defendants from proceeding with their claims in the Tribal Court.

## II.      RELEVANT FACTS

1.       Plaintiffs (hereinafter the "Church Entities") have been sued in the Tribal Court

by Defendants RJ and MM[1], who are members of the Navajo tribe.  *See* First Amended

Complaint For Personal Injury ("Complaint") attached hereto as Ex. A at ¶¶ 6-7.

2.       Doe Defendants claim that, in the late 1970's and early 1980's, they were part of

a program called the Indian Student Placement Program (the "ISPP"); that, as part of the ISPP,

they agreed to be placed in the homes of host families outside the Navajo reservation to attend

public school, and that, while living in these homes, they were sexually assaulted. *See id.* at ¶¶ 7,

14-24, 27.[2]  Doe Defendants do not allege that any abuse occurred on Navajo tribal lands.

Instead, every act of abuse that they allege occurred in Utah, far from the reservation.

---

[1] RJ and MM are now adults but, because they are alleged to have been sexually abused as
children, fictitious names have been used to protect their privacy.  Hereafter, they will be
referred to as "Doe Defendants."

[2] Unfortunately, but not surprisingly, because Plaintiffs' claims stretch back almost 40 years,
some witnesses have passed away.

3.    In an attempt to buttress their assertion of jurisdiction, Doe Defendants allege that certain conduct occurred on the reservation:

      a.     "The decision to remove Plaintiffs from their families was made by case workers and/or employees and/or agents of [the Church Entities] while on the Navajo Nation." *Id.* at ¶ 12;

      b.     On two occasions, once at a church and once at his home, "RJ disclosed the abuse to . . . . an employee of LDS Social Services." *See id* at ¶ 17;

      c.     "The negligent acts of repeatedly failing to warn Plaintiffs and their families, failing to report ongoing sexual abuse to police, placing Plaintiffs in dangerous homes etc., occurred within the Navajo Nation." *Id* at ¶ 43.

4.    The reality is different. The ISPP was administered by LDS Social Services, (now known as LDS Family Services). Tribal members who wished to participate in the program did so voluntarily with the agreement of their families. LDS Social Services maintained an office in Cedar City, Utah with regional responsibility for the ISPP, including working with members of the Navajo Nation. Decisions regarding the placement of participating tribal members from the part of the reservation where Doe Defendants lived were made by LDS Social Services employees operating from their offices in Cedar City and Salt Lake City, with input from the ecclesiastical leaders of the host families where the tribal members were placed. *See* Declaration of Roger Van Komen (attached hereto as Ex. B) at ¶ 4.

5.    Doe Defendants seek monetary damages and injunctive relief requiring the Church Entities to: (1) adopt world-wide policy changes relating to the reporting of abuse, including policies that are more stringent than state law; (2) waive the right to challenge the constitutionality of laws on the subject; (3) repair the "social and cultural harm" allegedly caused by the ISPP by writing letters of apology to the Navajo Nation; and (4) "implement programs(s)

for individuals abused while participants in [the ISPP] that will restore harmony in their lives using both traditional Navajo healing methods and medical services; if needed." *Id.* at ¶¶ 54-73.

## III.    ARGUMENT

It is well-established that courts have the inherent authority to grant temporary restraining orders "'to preserve the status quo pending a final determination of the rights of the parties,' in order 'to preserve the power to render a meaningful decision on the merits.'" *Resolution Tr. Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992) (quoting *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986)). The Tenth Circuit requires that the Church Entities demonstrate four factors to establish that temporary injunctive relief is appropriate. They are: (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the non-movant; and (4) the injunction would not be adverse to the public interest. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001); *Stevens v. Ocwen Fed. Bank FSB*, No. 2:06-CV-397 TS, 2006 WL 1409139, at *1 (D. Utah May 17, 2006) ("[t]he standard for granting a TRO is the same as that for a preliminary injunction"). The Church Entities satisfy each of these elements.

### A.    THE CHURCH ENTITIES WILL PREVAIL ON THE MERITS

#### 1.    Tribal Courts Have Strictly Limited Jurisdiction Over Nonmembers

Whether tribal courts have jurisdiction over nonmembers is a federal question. *Plains Commerce Bank*, 554 U.S. at 324. Far from possessing general jurisdiction, *see Nevada*, 533 U.S. at 367, tribal courts exercise authority that "centers on the land held by the tribe and on

tribal members within the reservation." *Plains Commerce Bank*, 554 U.S. at 327. Consequently,

tribal jurisdiction "generally does not extend to nonmembers." *Id.* at 340. As the Supreme Court

has explained, "[f]or powers not expressly conferred upon them by federal statute or treaty,

Indian tribes must rely upon their retained or inherent sovereignty." *Atkinson Trading Co.*, 532

U.S. at 649-50.

The scope of inherent tribal jurisdiction over non-Indians is controlled by *Montana v.*

*United States*, 450 U.S. 544 (1981). *Montana* reaffirmed that "the inherent sovereign powers of

an Indian tribe <u>do not extend to the activities of nonmembers of the tribe</u>." *Id.* at 565 (emphasis

added). This statement of the limits of tribal power over nonmembers has become known as the

"*Montana* Rule."[3] While acknowledging the possibility that tribal courts, in appropriate

circumstances, may have civil jurisdiction over nonmember conduct within the reservation's

borders, the Supreme Court has never endorsed the exercise of civil adjudicatory authority over a

nonmember. And no Supreme Court decision has ever recognized tribal jurisdiction over a

nonmember for conduct outside of tribal lands. *See Plains Commerce Bank*, 554 U.S. at 332

("*Montana* and its progeny permit tribal regulation of non-member *conduct* inside the

reservation….") (emphasis in original).

---

[3] *Montana* addressed the tribe's power to impose hunting and fishing regulations on non-Indian
land within the reservation rather than the adjudicatory authority of the tribal courts. Following
the *Montana* decision, in *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997), the U.S. Supreme
court expanded the Montana Rule to the tribe's adjudicative jurisdiction:

> As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its
> legislative jurisdiction. Absent congressional direction enlarging tribal court
> jurisdiction, we adhere to that understanding. Subject to controlling provisions in
> treaties and statutes, and the two exceptions identified in *Montana,* the civil
> authority of Indian tribes and their courts with respect to non-Indian fee lands
> generally "do[es] not extend to the activities of nonmembers of the tribe."

The *Montana* Rule governs this case. While the Rule is subject to two limited

exceptions,[4] those caveats only apply to conduct occurring *on the reservation. See, e.g., Hornell*

*Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1091 (8th Cir. 1998). In *Hornell*,

for example, the Eighth Circuit stated that the *Montana* exceptions did not apply because the

conduct at issue occurred outside the reservation.

> Indian tribes do, however, "retain inherent sovereign power to exercise some
> forms of civil jurisdiction over non-Indians *on their reservations*." The operative
> phrase is "on their reservations." Neither *Montana* nor its progeny purports to
> allow Indian tribes to exercise civil jurisdiction over the activities or conduct of
> non-Indians occurring outside their reservations.

*Id.* (citing *Montana,* 450 U.S. at 465) (emphasis in original); *see also Philip Morris USA, Inc. v.*

*King Mountain Tobacco Co, Inc.*, 569 F.3d 932, 938 (9th Cir. 2009) ("[T]ribal jurisdiction is, of

course, cabined by geography: The jurisdiction of tribal courts does not extend beyond tribal

boundaries." (citing *Atkinson Trading Co.,* 532 U.S. at 658 n. 12, 121 S. Ct. 1825).)

There is good reason for restricting tribal jurisdiction over nonmembers. As Justice

Souter noted, nonmembers compelled to litigate in tribal courts lack customary procedural

protections:

> Tribal courts []differ from other American courts (and often from one another) in
> their structure, in the substantive law they apply, and in the independence of their
> judges. Although some modern tribal courts "mirror American courts" and "are
> guided by written codes, rules, procedures, and guidelines," tribal law is still
> frequently unwritten, being based instead "on the values, mores, and norms of a
> tribe and expressed in its customs, traditions, and practices," and is often "handed
> down orally or by example from one generation to another." … The resulting law

---

[4] "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. … A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 565-566.

applicable in tribal courts is a complex "mix of tribal codes and federal, state, and traditional law," which would be unusually difficult for an outsider to sort out.

*Nevada*, 533 U.S. at 384-385, 121 S. Ct. 2304 (Souter, J., concurring) (quotations and citations omitted). More significantly, nonmember litigants in tribal court do not enjoy the federal constitutional right of due process or the guarantees of the Bill of Rights. *See Duro v. Reina*, 495 U.S. 676, 693 (1990) ("It is significant that the Bill of Rights does not apply to Indian tribal governments.").

2.    The Navajo Tribal Court Lacks Jurisdiction Here

*a.    Tribal jurisdiction does not extend to tort claims arising from abuse that occurred outside the reservation.*

The Tribal Court cannot exercise jurisdiction over the Church Entities, because the alleged abuse took place outside the borders of the Navajo reservation. Doe Defendants claim they were the victims of abuse while living with nonmember host families in various Utah cities and towns. (Fact ¶ 2). They do not claim that any of the alleged abuse occurred on the reservation. Without even an allegation that they were injured on Indian lands, Doe Defendants cannot escape the force of the *Montana* Rule—which precludes tribal jurisdiction over nonmembers for conduct beyond the tribe's territorial sovereignty. *See Plains Commerce Bank*, 554 U.S. at 332.[5]

---

[5] A related issue is before the U.S. Supreme Court in *Dollar General Corp. and Dolgencorp, LLC v. The Mississippi Band of Choctaw Indians*, Docket No. 13-1496. There, the Court will decide whether tribal jurisdiction extends to tort claims against a nonmember company for the alleged sexual abuse of an Indian teen on reservation lands. Briefing and argument are completed and a decision is expected by June 30. Once decided, that case may resolve the jurisdictional issue here by holding that nonmembers are not subject to tribal jurisdiction, even for wrongs committed on tribal lands. The prospect of such a definitive resolution by the Supreme Court is reason alone to stay any proceeding in Tribal Court pending the outcome of *Dollar General Corp.*

In a transparent attempt to manufacture tribal court jurisdiction, Doe Defendants allege they were damaged by conduct that occurred (or should have occurred) on the reservation. (Fact ¶ 3). That alleged conduct, however, is insufficient to create tribal jurisdiction.

First, the Doe Defendants claim that the decisions to remove them from their families and place them in host homes off the reservation were made by agents of the Church Entities "while on the Navajo Nation." [6] (*Id.*) But, ISPP participants were not "removed" from their homes in the sense that the State might remove a child from its home pursuant to statutory authority or court order. LDS Social Services, of course, had no such authority. Participation in the ISPP was a voluntary decision by families who wished to be part of the program. (Fact ¶ 4). What is more, placement decisions were not made on tribal lands. Rather, those decisions were made by LDS Social Services employees operating from their offices in Cedar City and Salt Lake City, assisted by ecclesiastical leaders in the cities and towns of the host families with whom the tribal members were placed. (*Id.*)

Second, Doe Defendants claim they disclosed the abuse to an agent of the Church Entities when he was visiting the reservation. (Fact ¶3.) This allegation cannot give rise to tribal court jurisdiction, even if true, because hearing a report of abuse is not an "act" occurring on the

---

[6] Doe Defendants also allege, in conclusory fashion, that the Church Entities "conducted continuous and systematic activities within the Navajo Nation." Complaint at ¶¶ 6-7. Doe Defendants do not explain what they mean by "continuous and systematic activity." While it is true that there are LDS Churches on the reservation and, at times, missionaries have proselyted there, these actions do not give the Tribal Court jurisdiction. *See, e.g., Atkinson Trading Co. v. Shirley,* 532 U.S. 645, 656 (2001) ("A nonmember's consensual relationship in one area … does not trigger tribal civil authority – it is not in for a penny, in for a pound.")

reservation. Doe Defendants' complaint is not that the agent acted on the reservation, but that he did not act in failing to report what he had allegedly heard. Non-action on the reservation cannot give rise to tribal jurisdiction. *See Plains Commerce Bank*, 554 U.S. at 332 ("*Montana* and its progeny permit tribal regulation of nonmember *conduct* inside the reservation…." (emphasis in original).)

Finally, Doe Defendants allege that the failure to report the abuse to Doe Defendants' parents or police occurred on the reservation. Again, however, this allegation is not of an "act" that occurred on the reservation. At most, Doe Defendants allege the Church Entities did not do something on the reservation that they should have done. Simply put, there is no *conduct* occurring on the reservation that would trigger an exception to the *Montana* Rule and, therefore, the judicial powers of the Navajo Nation do not extend to the Church Entities.

> b.      *Any doubts should be resolved against tribal jurisdiction because of the threatened loss of the Church Entities' constitutional rights.*

That Doe Defendants are seeking to extend tribal jurisdiction far beyond of the bounds set by the U.S. Supreme Court is highlighted by the relief they seek. Doe Defendants would impose world-wide changes to church policy. These changes include the removal of church leaders when any allegation of abuse is made, specifying to whom church leaders must report suspicions of abuse, dictating the instruction and training given to church leaders, precluding the Church Entities from challenging the legitimacy of unconstitutional laws, and requiring the Church Entities to establish and fund programs to "restore harmony" in the lives of Indians using traditional Navajo healing methods (which, themselves, could be considered "religious" in nature.). (Fact ¶5.)

With these sweeping demands, Doe Defendants seek not only to extend Tribal Court

jurisdiction far in excess of the regulatory authority of the tribe[7], they also ask the Tribal Court to

infringe on the Church Entities' constitutional rights.  The First Amendment embodies "a spirit of

freedom for religious organizations, an independence from secular control or manipulation-in short,

power to decide for themselves, free from state interference, matters of church government as well as

those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in*

*NAm.,* 344 U.S. 94, 116 (1952); *see also Bd. of Church Extension v. Eads,* 159 W. Va. 943, 946-

56 (1976)  ("The power of the civil courts to interfere with the internal operations of churches is

severely limited by the First Amendment to the Constitution of the United States.")  Courts and

legal scholars refer to this principle as the "church autonomy doctrine." That doctrine precludes

civil courts from becoming entangled in "'a matter which concerns ... church discipline,

ecclesiastical government, or the conformity of the members of the church to the standard of

morals required of them.'" *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich,* 426

U.S. 696, 713-14 (1976) (citation omitted).

The church autonomy doctrine is a corollary of the Constitution's separation of church

and state–a recognition that churches have "autonomy in making decisions regarding their own

internal affairs." *Bryce v. Episcopal Church in the Diocese of Colo.,* 289 F.3d 648, 655 (10th Cir.

2002).  Prohibiting a church from speaking in opposition to legal measures inimical to its

interests would be an unmistakable instance of viewpoint discrimination in violation of free

speech, *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), and a

---

[7] *See Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) ("a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction.")

prior restraint on core political speech. *See Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) (prior restraint); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (political speech).

Even if jurisdiction in the Tribal Court were a close question—and it is not—Doe Defendants' quest to deprive the Church Entities of their constitutional rights should decide the matter. Repeatedly, the Supreme Court has expressed concern that tribal authority over nonmembers is unconstrained by constitutional protections. *See Plains Commerce Bank*, 554 U.S. at 337 ("The Bill of Rights does not apply to Indian tribes.") (citation omitted); *Duro v. Reina*, 495 U.S. 676, 693 (1990) (focusing on "consent and the protections of citizenship" is proper because "[i]t is significant that the Bill of Rights does not apply to Indian tribal governments."). Indeed, *Montana's* "presumption against tribal-court civil jurisdiction squares with … an overriding concern that citizens who are not tribal members be 'protected … from unwarranted intrusions on their personal liberty.'" *Nevada*, 533 U.S. at 384 (Souter, J., concurring) (quotation omitted). Hence, unless this Court enjoins the Doe Defendants, the Church Entities will be compelled to defend themselves in a tribal forum where their constitutional rights are being openly attacked.

        3.       Exhaustion In Tribal Court Is Not Required

As a general rule, "federal courts should abstain from hearing cases that challenge tribal court jurisdiction until tribal court remedies, including tribal appellate review, are exhausted." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1149 (10th Cir. 2011). But "[w]hen the dispute involves non-Indian activity occurring outside the reservation, however, the policies behind the tribal exhaustion rule are not so obviously served." *Texaco, Inc. v. Zah*, 5 F.3d 1374,

1377 (10th Cir. 1993). For this reason, federal courts have recognized exceptions to the exhaustion requirement, including "where it is clear that the tribal court lacks jurisdiction and that judicial proceedings would serve no purpose other than delay." *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d 1226, 1238 (10th Cir. 2014) (citations omitted).

The conduct giving rise to Doe Defendants' claims in Tribal Court did not occur on the reservation. As such, the policies supporting the exhaustion rule are not served here. Seen for what it is, Doe Defendants are attempting to invoke Tribal Court jurisdiction over nonmembers for activities outside of the reservation. That goes directly against well-established case law that cuts off Tribal Court jurisdiction at the reservation border. It is clear that the Tribal Court lacks jurisdiction here, and, for that reason, exhaustion would serve no purpose other than to delay. *See, e.g., Crowe & Dunlevy*¸640 F.3d at 1149; *see also Strate*, 520 U.S. at 459; *Hornell Brewing Co.*, 133 F.3d at 1093 (seeing "no need for further exhaustion" because it was "plain that the Breweries' conduct outside the Rosebud Sioux Reservation does not fall with the Tribe's inherent sovereign authority.")

B.     THE CHURCH ENTITIES WILL SUFFER IRREPARABLE  HARM IF FORCED TO LITIGATE IN A COURT WITH NO JURISDICTION

Because the Tribal Court lacks jurisdiction, the Church Entities will suffer irreparable harm if forced to litigate there. A litigant demonstrates irreparable harm by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Furthermore, "[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative" and will be deemed to have satisfied its burden. *Id.* Here, the Church Entities clearly satisfy that burden.

First, as discussed above, because Doe Defendants' requested relief would violate the Church Entities' First Amendment rights, and because tribal law is unconstrained by federal due process protections, the Church Entities would be irreparably harmed by being subjected to tribal court jurisdiction. *See, infra,* § III(A)(2)(b). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citation omitted). Indeed, this Court has held that the "[v]iolation of core constitutional rights is almost always an irreparable harm." *Utah Republican Party v. Herbert*, 133 F.Supp. 1337, 1346 (D. Utah 2015) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary"). For this reason alone, the Church Entities have demonstrated irreparable harm.

What is more, Courts have routinely concluded that the risk of being forced to spend unnecessary time, money, and effort litigating in a court that does not have jurisdiction constitutes irreparable harm. *See, e.g., Crow v. Dunlevy, P.C. v Stidham*, 609 F.Supp.2d 1211, 1222 (N.D. Okla. 2009); *see also UNC Res. Inc. v. Benally,* 518 F. Supp. 1046, 1053 (D. Ariz., 1981) (granting motion for preliminary injunction given plaintiff's argument that tribal court lacked jurisdiction); *Kerr-McGee Corp. v. Farley,* 88 F.Supp.2d 1219 (D.N.M. 2000)("The Court finds that Kerr-McGee will suffer irreparable damage if Tribal Claimants are not enjoined from proceeding in Navajo Court, as demonstrated by the expense and time involved in litigating this case in tribal court."); *Seneca-Cayuga Tribe Of Oklahoma. State of Oklahoma,* 874 F.2d 709(10th Cir. 1989) ("The Tribes would also be forced to expend time and effort on litigation in a court that does not have jurisdiction over them...."); *Chiwewe v. The Burlington Northern and*

*Santa Fe Railway Co.,* 2002 WL 31924768 (D.N.M.)(same). As shown above, the Tribal Court

lacks jurisdiction in this matter and, therefore, the Church Entities' would suffer irreparable harm

if compelled to litigate in that forum.

### C. THE BALANCE OF HARMS SUPPORTS ENJOINING THE PROCEEDINGS IN TRIBAL COURT

Doe Defendants will not suffer unfair prejudice if proceedings in Tribal Court are

enjoined. They can file their suit in Utah courts, the proper forum, and seek relief there. Given

the infancy of this case, there will be no significant delay associated with a change in forum.

In contrast, the Church Entities would be irreparably harmed by having to litigate in a

forum where federal law does not authorize tribal jurisdiction over non-Indians and where they

would be subject to the loss of their most basic constitutional rights. *See infra* §III(B).

### D. THE PUBLIC INTEREST WILL NOT BE HARMED BY ENJOINING THE TRIBAL COURT PROCEEDING

There is usually little public interest in a tort dispute between private parties. However,

where, as here, the constitutional rights of one of party are threatened, the public interest weighs

heavily in favor of protecting those rights. *See Nevada*, 533 U.S. at 384 (Souter, J., concurring)

(expressing an overriding concern that citizens who are not tribal members be 'protected … from

unwarranted intrusions on their personal liberty.'")

There is also a significant public interest in preventing a tribal court from exercising

jurisdiction over nonmembers where it has none. *See Ford Motor Company v. Todocheene,* 258

F.Supp.2d 1038, 1057 (D. Ariz. 2002). Courts have routinely held that the public interest is

served by preventing tribal courts from proceeding in cases where they lack jurisdiction. *See, e.g.*

*UNC Resources Inc. v. Bennalfy,* 514 F. Supp. 358 (D.N.M. 1981) ("Nor will the public interest

be harmed by an injunction preventing the defendants from participating in an unlawful exercise of tribal power."); *Chiwewe v. The Burlington Northern and Santa Fe Railway Co.,* 2002 WL 31924768 (D.N.M.)(same); *Kerr-McGee Corporation* v. *Farley,* 88 F.Supp.2d 1219 (D.N.M. 2000).

## IV.    CONCLUSION

The Church Entities' request for a temporary injunction satisfies all four elements required for relief. They will prevail on the merits because tribal court jurisdiction is unquestionably lacking. They face irreparable harm if forced to proceed with the defense of the suit in a forum with no jurisdiction.  In comparison, there is no unfair prejudice to Doe Defendants, who may pursue their claims in Utah courts.  Finally, the public interest would be served by appropriately limiting the jurisdiction of the Tribal Court.

Therefore, the Church Entities request that the Court grant the present motion and enjoin any further proceedings in the Tribal Court

DATED:  May 31, 2016.

STOEL RIVES LLP

/s/ David J. Williams
David J. Jordan
David J. Williams
Attorneys for Plaintiffs
