EXHIBIT A
Complaint

William R. Keeler
Keeler & Keeler, LLP
108 E. Aztec Avenue
Gallup, NM 87301
(505) 722-5608

Craig K. Vernon (Pro Hac Pending)
Leander L. James (Pro Hac Pending)
James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur d'Alene, ID 83814
(208) 667-0683

Patrick Noaker (Pro Hac Pending)
Noaker Law Firm
333 Washington Avenue N., # 300
Minneapolis, MN  55401
(612) 839-1080

*Attorneys for Plaintiffs*

## NAVAJO NATION DISTRICT COURT

## DISTRICT OF WINDOW ROCK, ARIZONA

| | | |
|---|---|---|
| RJ and MM, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. <u>WR-CV-36-16</u> |
| | ) | |
| vs. | ) | |
| | ) | FIRST AMENDED COMPLAINT |
| THE CORPORATION OF THE PRESIDENT | ) | FOR PERSONAL INJURY |
| OF THE CHURCH OF JESUS CHRIST OF | ) | |
| LATTER-DAY SAINTS, a Utah corporation;; | ) | |
| LDS FAMILY SERVICES, a Utah corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Plaintiffs, through counsel, and based upon information and belief available at the time of

the filing of this Complaint, bring this Complaint under Navajo Law for damages resulting from

injuries suffered by Plaintiffs as a result of Defendants' negligence and other misconduct described

herein.

## I. **JURISDICTION AND VENUE**

1.      COMPLAINT FOR PERSONAL INJURY

1.      At the time of the events described in this Complaint, all parties resided on and/or maintained continuous and systematic contacts with the Navajo Nation.

2.      This Court has civil, personal and subject-matter jurisdiction over the Defendants based upon the consensual relationships between the Defendants and the Navajo Nation.

3.      This Court has civil, personal and subject-matter jurisdiction over the Defendants because the conduct of the Defendants described herein threatens the health, welfare and cultural well-being of the Navajo Nation.

## II. PARTIES

4.      Plaintiff RJ is an adult male who is an enrolled member of the Navajo Nation and resides within the boundaries of the Navajo Nation.  Plaintiff was a minor at the time of the sexual abuse alleged herein.  During the relevant time period, Plaintiff was a resident of the Navajo Nation where he was taken from the Navajo Nation by the Defendants and placed with foster families in Utah.  There, Plaintiff was sexually abused.  The name used by Plaintiff in this Complaint is not the real name of Plaintiff, but is a fictitious name used to protect the privacy of Plaintiff, a victim of childhood sexual abuse.

5.      Plaintiff MM is an adult female who is an enrolled member of the Navajo Nation and resides within the boundaries of the Navajo Nation.  Plaintiff was a minor at the time of the sexual abuse alleged herein.  During the relevant time period, Plaintiff was a resident of the Navajo Nation where she was taken from the Navajo Nation by the Defendants and placed with foster families in Utah.  There, Plaintiff was sexually abused.  The name used by Plaintiff in this Complaint is not the real name of Plaintiff, but is a fictitious name used to protect the privacy of Plaintiff, a victim of childhood sexual abuse.

6.      Defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints, is a corporation duly organized and operating pursuant to the laws of Utah (hereinafter "COP").  COP operates church meetinghouses within the Navajo Nation and in tens of thousands of other locations worldwide and is one of the corporate entities through which the LDS Church

conducts its affairs.  At all relevant times, the COP conducted continuous and systemic activities within the Navajo Nation.

7.      Defendant LDS Family Services is a nonprofit Utah corporation owned and operated by the LDS Church and related Defendants.  At all relevant times, LDS Family Services was acting as the agent of Defendants the LDS Church, the COP and/or the COPB.  Upon information and belief, LDS Family Services formerly operated under the name "LDS Social Services."  From approximately 1947 to the mid 1990's, LDS Family Services operated a program known as the "Indian Placement Program" or the "Lamanite Placement Program" (hereinafter the "LPP").  At all relevant times, Plaintiffs were sexually abused while they were participating in the LPP and while they were in the care and custody of the Defendants.  At all relevant times, LDS Family Services, in association with the other LDS Defendants, conducted continuous and systemic activities within the Navajo Nation.

8.      Defendants LDS Church, COP, COPB and LDS Family Services will be referred to collectively throughout the complaint as the "LDS Church" or "LDS Defendants"

### III. RELEVANT FACTS APPLICABLE TO ALL PLAINTIFFS

9.      At all times material hereto, Plaintiffs were participants in the LPP described in this Complaint.  Upon information and belief, the LPP was developed and maintained at the behest of and for the benefit of the LDS Defendants.  According to the 1968 version of the *Lamanite Handbook of the Church of Jesus Christ of Latter-day Saints,* in September of 1946, the acting President of the Church, George Albert Smith, appointed Spencer W. Kimball to head the General Lamanite Committee with the charge "to see that the gospel was carried to all the children of Lehi (which includes the Lamanites) all over the world."  Kimball's commitment to the Native Americans (commonly referred to as Lamanites by the Defendants) is explained in a January 7, 2016 article in Indian Country Today:

> Kimball's commitment to the Native Americans stemmed from the Mormon belief that America's indigenous people actually fled from Israel in the year 600 B.C. After settling in an unspecified location in the Americas, the people split up into

two groups: the Nephites, a righteous and civilized people; and the Lamanites, an "idle, savage and bloodthirsty" people who, after hardening their hearts, were cursed by God with a "skin of blackness" and thus became "loathsome."

*Read more at http://indiancountrytodaymedianetwork.com/2016/01/07/assimilation-tool-or-blessing-inside-mormon-indian-student-placement-program-162959*

10.     The LDS Church's desire to convert Native American or "Lamanite" children and assimilate them into their culture reflects teachings in the Book of Mormon, a book of canonized scripture unique to the Mormon religion. According to this canonized Mormon scripture, because the Lamanites had hardened their hearts against the Lord, they were *cursed* with a "skin of blackness" to distinguish them from the righteous Nephites.

And he had caused the cursing to come upon them, yea, even a sore cursing, because of their iniquity. For behold, they had hardened their hearts against him, that they had become like unto a flint; wherefore, as they were white, and exceedingly fair and delightsome, that they might not be enticing unto my people the Lord God did cause a skin of blackness to come upon them. (2 Nephi 5:21, *Book of Mormon*).

11.     At the time the Plaintiffs were taken from the Navajo Nation and placed into Mormon foster homes, the LDS Church taught that the Native Americans, including the Plaintiffs, were Lamanites as described in the Book of Mormon and summarized above. The leaders of the LDS Church felt driven to instruct the Lamanites within the Navajo Nation concerning their true ancestry and convert them back to the one true faith. Therefore, converting the Navajo Nation children and immersing them into white Mormon culture was not only rooted in Mormon scripture but believed to be divinely directed as the way to redeem and restore the "Lamanites" to their prophetic destiny. An example of this belief is a quote by long time Mormon Prophet, Spencer W. Kimball, who suggested that Latter-day Saint Native Americans was gradually turning lighter, essentially breaking the dark skin curse:

I saw a striking contrast in the progress of the Indian people today... The day of the Lamanites is nigh. For years they have been growing delightsome, and they are now becoming white and delightsome, as they were promised. In this picture of the twenty Lamanite missionaries, fifteen of the twenty were as light as Anglos, five were darker but equally delightsome. The children in the home placement program in Utah are often lighter than their brothers and sisters in the hogans on the reservation. At one meeting a father and mother and their sixteen-year-old daughter

4.     COMPLAINT FOR PERSONAL INJURY

we represent, the little member girl—sixteen—sitting between the dark father and mother, and it was evident she was several shades lighter than her parents—on the same reservation, in the same hogan, subject to the same sun and wind and weather .... These young members of the Church are changing to whiteness and to delightsomeness. *Conference Report*, October 1960; *Improvement Era*, December 1960, pp. 922–23.

12.    Upon information and belief, in order to qualify for the LPP, Navajo Children had to be at least eight years old and baptized members of the Mormon Church in good standing.    All Plaintiffs were baptized members of the Mormon Church while residing on the Navajo Nation. The decision to remove Plaintiffs from their families was made by case workers and/or employees and/or agents of Defendants while on the Navajo Nation.    Plaintiffs were then transported off the Navajo Nation and moved to Utah and placed with Mormon foster families.    Upon information and belief, the foster families received stipends and/or subsidies (and were promised unspecified spiritual blessings) from the LDS Defendants for each Native American child placed in the home.

13.    Upon information and belief and at all relevant times, the Mormon foster families into whose homes Plaintiffs were placed, were the employees and/or agents of Defendants the LDS Church, the COP, the COPB and/or LDS Family Services.    At all relevant times, Defendants the LDS Church, the COP, the COPB and/or LDS Family Services had care and custody of the Plaintiffs during Plaintiffs' involvement with the LPP and for the duration of their placement into Mormon foster family homes in Utah.    All acts of sexual abuse alleged herein took place during the LPP while Plaintiffs were in the custody and control of the Defendants.

*Plaintiff RJ*

14.    In approximately August of 1978, Plaintiff RJ, who was approximately 10 years old, was baptized a member of the LDS Church in order to became involved in the LPP.    Then, the LDS Defendants removed RJ from his home in Sawmill, Arizona, within the boundaries of the Navajo Nation, and placed him with the Lovell family in Oak City, Utah, in approximately August of 1978 for the start of what is believed to be RJ's fourth grade year in school.    During RJ's placement in the Lovell home, RJ was sexually molested on various occasions (to include sexual penetration) by a step brother who was about 4 years older.    RJ also suffered physical, emotional

and cultural abuse by his foster mother to include, but not limited to, forcibly having his mouth washed out with soap whenever he spoke Navajo to the other placement children in the home.

15.    RJ disclosed this abuse to Mel and Donna Anderson, who lived in Oak City at the time, and who previously were LDS Missionaries on the Navajo Nation, where RJ was baptized and recruited to the LPP. After the Christmas break, RJ was taken out of the Lovell home and placed with the Andersons for the remainder of that school year. Then, RJ returned to his family within the Navajo Nation.

16.    The following school year (believed to be 5th grade), RJ was placed with Tom and Sharon Anderson. During springtime of his 5th grade year, RJ was sexually molested on at least one occasion by an older foster brother.

17.    RJ disclosed the sexual abuse he suffered in 4th grade and in 5th grade to agents of LDS Defendants, including but not limited to his LPP case worker, James (Jaymes) Helmstetler, who was believed to be an employee of LDS Social Services. RJ disclosed the abuse to Mr. Helmstetler within the Navajo Nation, on at least two different occasions following his 4th and 5th grade years. The locations of these disclosures included the LDS Chapel (Window Rock Ward or Branch) in St. Michael's, Arizona and at his home in Sawmill, Arizona.

18.    For his 7th grade year, RJ was again removed from his home within the Navajo Nation by the LDS Defendants and placed with the Edwards family, in Centerfield, Utah. During his placement with the Edwards family, despite repeated disclosures to LDS Defendants about the sexual abuse within the LPP, Plaintiff RJ was again sexually abused. One of his sisters was also placed with this same family and RJ witnessed this sister being sexually abused as well.

19.    When RJ returned to the Navajo Nation following his 7th grade year, he again disclosed to agents of LDS Defendants, including James Helmsteddler, the new sexual abuse that was happening to him and his sister at the Edwards home. Despite this disclosure, for his 8th grade year, RJ was again removed from the Navajo Nation by the LDS Defendants and again placed with the Edwards family. During his 8th grade year, RJ himself was not sexually abused, however, he witnessed the same sister being sexually abused as had occurred during the previous year.

6.    COMPLAINT FOR PERSONAL INJURY

Additionally, a younger sister was also placed in that home; he witnessed inappropriate sexual conduct and sexual abuse directed at her as well.

20.     RJ remained with the Edwards family during his 9th grade year as well. While he didn't suffer any sexual abuse himself, during that year, RJ again witnessed his younger sister being sexually abused.

21.     The sexual abuse that RJ suffered included fondling, sexual molestation, and sexual penetration. Additionally, he witnessed his sisters being sexually abused. As a direct result of the wrongful conduct alleged herein, RJ has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and continues to sustain loss of earnings and earning capacity; and/or has incurred and continues to incur expenses for medical and psychological treatment, therapy, and counseling.

### *Plaintiff MM*

22.     Plaintiff MM is an adult female residing who is an enrolled member of the Navajo Nation and resides within the boundaries of the Navajo Nation. At all relevant times, MM was a minor residing within the Navajo Nation. In approximately 1976, when Plaintiff MM was approximately 11 years old, she was baptized a member of the LDS Church in order to participate in the LPP. Then, the LDS Defendants removed MM from her home in Sawmill, Arizona, within the boundaries of the Navajo Nation, and placed her with the Munger family in Gunnison, Utah, in approximately August of 1976 for the start of what is believed to be MM's fifth grade year in school. During MM's placement in the Munger home, she was raped (sexual intercourse) by Gary Westlund, a friend of her step brother. This pedophile was believed to be approximately 40 years old at the time. Prior to this rape, Westlund was a frequent visitor and present in the Munger home; his presence and familiarity towards MM was known not only to the foster brother but also to

MM's foster parents.

23.    MM returned to the Navajo Nation the summer following her 5th grade year.  For her 6th grade year, MM was not returned to the Munger family; however, she continued in the LPP. From 6th grade through 10th grade, she participated in the LPP without incident.

24.    For her 11th and 12th grades (believed to be 1981-1983), MM was again removed from her home within the Navajo Nation by the LDS Defendants and placed with the Edwards family in Centerfield, Utah.  During her placement with the Edwards family, MM was sexually abused by her foster father.  This abuse included, but is not limited to, multiple incidents of fondling of MM's private parts and at least one instance when the foster father entered MM's bedroom, uninvited and unannounced, and coerced MM into grabbing his penis and masturbating him.  Additionally, MM became aware that her younger brother and younger sister, who were also placed with this same family, were being sexually abused.

25.    As a direct result of the wrongful conduct alleged herein, MM has suffered, and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and continues to sustain loss of earnings and earning capacity; and/or has incurred and continues to incur expenses for medical and psychological treatment, therapy, and counseling.

## IV.  FIRST CAUSE OF ACTION
## CHILDHOOD SEXUAL ABUSE

26.    Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

27.    Between 1976-1983 Plaintiffs, on multiple occasions, were sexually abused while they participated in the LPP under the care and custody of the LDS Defendants.

28.    The sexual abuse was either committed by individuals who at all times were in the course and scope of acting as servants and/or agents of the LDS Defendants, or was committed by

others who were known to these servants and/or agents or under the control and supervision of these servants and/or agents, making the LDS Defendants vicariously liable for the injuries caused by Plaintiffs' abusers under the doctrine of respondeat superior.

29.     Upon information and belief, prior to or during the abuse alleged above, the LDS Defendants knew, had reason to know, or were otherwise on notice of the unlawful sexual conduct by certain foster family members under the LPP.  Defendants failed to take reasonable steps and failed to implement reasonable safeguards to avoid acts of unlawful sexual conduct in the future by these certain foster family members, including, but not limited to, removing Plaintiffs from the foster homes where sexual abuse was occurring and/or placing Plaintiffs in foster homes where they knew or should have known that Plaintiffs were at an increased risk of being sexual abused. Furthermore, at no time during the periods of time alleged did Defendants have in place a system or procedure to supervise and/or monitor employees, volunteers, representatives, or agents to ensure that they did not molest or abuse minors or allow such to occur.

30.     Upon information and belief, after learning that RJ and MM were being sexually abused during their participation in the LPP and while under the care and custody of their LPP foster parents, the LDS Defendants, by and through their agents, ratified the wrongful conduct described herein by failing to report it to law enforcement authorities, prospective LDS members, current LDS members, their families, victims, and the public.

31.     As a result of the above-described conduct, Plaintiffs have suffered, and continue to suffer, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer spiritually; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and will continue to sustain loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

42.     The LDS Defendants breached their duty of care to the minor Plaintiffs by allowing certain LPP foster family members to come into contact with the minor Plaintiffs without supervision; by failing to adequately supervise certain LPP foster family members and family friends who they permitted and enabled to have access to Plaintiffs; by failing to investigate or otherwise confirm or deny such facts about certain LPP foster family members or family friends; by failing to tell or concealing from Plaintiffs, Plaintiffs' parents, guardians, or law enforcement officials that certain LPP foster family members and family friends were or may have been sexually abusing minors; by failing to tell or concealing from Plaintiffs' parents, guardians, or law enforcement officials that Plaintiffs were or may have been sexually abused after Defendants knew or had reason to know about the sexual abuse, thereby continuing to endanger Plaintiffs.

43.     The negligent acts of removing Plaintiffs from the Navajo Nation and the decision to place them in dangerous homes occurred on the Navajo Nation.     Likewise, the failure to disclose to Plaintiffs' parents, to police or to child protective services, about sexual abuse that was occurring within the LPP also occurred within the Navajo Nation.

44.     As a result of the above-described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer spiritually; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and will continue to sustain loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## VII. FOURTH CAUSE OF ACTION
## NEGLIGENT SUPERVISION/FAILURE TO WARN

45.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

46.     The LDS Defendants had a duty to provide reasonable supervision of LPP foster families; to use reasonable care in investigating potential LPP foster families; and to provide

adequate warning to the Plaintiffs, the Plaintiffs' family, and minor LPP participants of certain LPP foster family members' dangerous propensities and unfitness.

47.     The LDS Defendants by and through their agents, servants and/or employees, knew or reasonably should have known of the dangerous and exploitive propensities of certain LPP foster family members/family friends and/or that certain LPP foster family members/family friends were unfit agents.  Despite such knowledge, the LDS Defendants negligently failed to supervise the LPP foster families who the LDS Defendants placed in the position of trust and authority as religious instructors, surrogate parents, spiritual mentors, emotional mentors, and/or other authority figures, where they were able to commit (or allow others to commit) the wrongful acts against the Plaintiffs.  The LDS Defendants further failed to take reasonable measures to prevent future sexual abuse while Plaintiffs were in the LPP.

48.     The negligent acts of repeatedly failing to warn Plaintiffs and their families, failing to report ongoing sexual abuse to police, placing Plaintiff's in dangerous homes etc., occurred within the Navajo Nation.

49.     As a result of the above-described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer spiritually; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and will continue to sustain loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## VIII.  FIFTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

50.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

51.     Defendants' conduct was extreme and outrageous and was intentional or done recklessly.

52.     As a result of Defendants' conduct, Plaintiffs have experienced and continue to experience severe emotional distress.

53.     As a result of the above-described conduct, Plaintiffs have suffered, and continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; have suffered and continue to suffer spiritually; were prevented and will continue to be prevented from performing Plaintiffs' daily activities and obtaining the full enjoyment of life; have sustained and will continue to sustain loss of earnings and earning capacity; and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## IX.  SIXTH CAUSE OF ACTION - EQUITABLE RELIEF

54.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

55.     Plaintiffs also pray for equitable relief from this Court, for non-monetary redress and the protection of Plaintiffs and other similarly situated members of the public and children, as follows:

### *POLICY CHANGES*

56.     That the LDS Defendants change their current corporate policies regarding reporting of suspected child sexual abuse.  Upon information and belief, the current policy as set forth in *2010 Handbook 2: Administering the Church, Section 13.6.18*, which provides that "[i]f a leader becomes aware of physical, sexual or emotional abuse of someone during a Church activity, he or she should contact the bishop immediately."

57.     Instructions for bishops are provided in *Handbook 1:17.3.2*, which provides in pertinent part, "[i]n the United States and Canada, the Church has established a help line to assist stake presidents and bishops in cases of abuse … When calling the help line, leaders will be able to consult with professional counselors and legal specialists who can help answer questions and formulate steps to take … Leaders can obtain information about local reporting requirements

through the help line.   Where reporting is required by law, the leader encourages the member to secure qualified legal advice.   To avoid implicating the Church in legal matters to which it is not a party, Church leaders should avoid testifying in civil or criminal cases or other proceedings involving abuse." *Handbook 1, State Presidents and Bishops 2010, Section 17.3.2.*

58.   Because the current policies do not adequately protect children but rather aim to protect the LDS Defendants, Plaintiffs request that these policies be changed and include the following:

a.   Where a charge of sexual abuse of a child has been made against any agent, leader, or member of the Church, he or she shall be immediately removed from exposure to children and all appropriate safeguards shall be made to keep him or her away from children pending investigation.

b.   Whenever any leader or member in the Church has reasonable suspicion of child sexual abuse, whether the abuse happened during a "Church activity" or not, this leader or member shall report the abuse first to the police and child protective services.

c.   Every Church leader shall be a mandatory reporter of child sexual abuse, regardless of whether mandatory reporting is required by law.

d.   Instead of directing its leaders to not cooperate with civil or criminal authorities (if the Church could in any way be implicated) in situations involving abuse, there shall be an affirmative statement in both *Handbook 1* and *Handbook 2* that leaders and members shall cooperate with civil and criminal authorities in cases involving child sexual abuse; this includes truthfully testifying at depositions, hearings, trials and other proceedings, regardless of whether such testimony would implicate the Church or not.

e.   That Defendants never seek to direct, pay, or hire any agent or employee or third party to retract, oppose, or challenge the constitutionality or legitimacy of any reform of a civil or criminal statute of limitations, mandatory child abuse reporting clergy exemptions, or repeal of the clergy-penitent privilege or other laws which serve to shield child sexual abusers from investigation, apprehension, prosecution, and conviction in

15.   COMPLAINT FOR PERSONAL INJURY

Arizona or similar legislation or law in any other state or jurisdiction;

## X. SEVENTH CAUSE OF ACTION – COMMON LAW NUISANCE
## AND REQUEST FOR INJUNCTIVE RELIEF

59.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

60.     As reflected in its corporate policies, Defendants continue to engage in efforts to: 1) conceal from the general public, from police and applicable child protective services, instances of child sexual abuse and, by extension, the identity of child molesters, by failing to instruct its members and leaders to report child sex abuse to appropriate criminal and civil authorities;  2) protect its image and not children by instructing its members and lower level leaders to report child sexual abuse to Bishops and/or Stake Presidents; then instruct these high level leaders to call a Church help line to consult with legal and other professionals instead of calling the police.  In fact, the current policy specifically commands … "To avoid implicating the Church in legal matters to which it is not a party, Church leaders should avoid testifying in civil or criminal cases or other proceedings involving abuse." *Handbook 1, State Presidents and Bishops 2010, Section 17.3.2.*

61.     The conduct and concealment by Defendants has knowingly and/or recklessly created or maintained a condition which unreasonably endangers the safety and health of a considerable number of persons, including, but not limited to, children and residents of the Navajo Nation who live where Defendants agents live.  Defendants' failure to have proper policies and procedures that direct its members to report child sexual abuse to proper authorities has knowingly and/or recklessly endangered the safety and health of people by allowing child molesters to avoid prosecution and remain living freely in unsuspecting communities.  These child molesters, known to agents of the Defendants, but not to the public, pose a threat of additional abuse to children.

62.     The unreasonable, knowing and reckless conduct by Defendants has specifically been injurious to Plaintiffs' health in that Plaintiffs have experienced mental and emotional distress as a result of Defendants' negligence and/or concealment; that Plaintiffs have not been able to help other children from being molested because of Defendants' ongoing corporate policies that protect

16.     COMPLAINT FOR PERSONAL INJURY

Defendants and child molesters but expose children.

63.     The continuing public nuisance created by Defendants was, and continues to be, the proximate cause of damages to the general public within the Navajo Nation and of Plaintiffs' injuries and damages as alleged.

64.     In doing the aforementioned acts, Defendants have acted unreasonably by knowingly and/or recklessly creating or maintaining a condition which endangers the safety or health of a considerable number of persons within the Navajo Nation, and with conscious disregard for Plaintiff's rights.

65.     As a result of the above-described conduct, Plaintiffs have suffered the injuries and damages described above.

## XI. EIGHTH CAUSE OF ACTION-NAVAJO COMMON LAW

66.     Plaintiffs incorporate all paragraphs of this Complaint as if fully set forth herein.

67.     Diné bi beenahazanni (Navajo Common Law) consists of custom and usages of the Navajo people.

68.     Navajo concept of K'e helps frame the Navajo perception of moral right and of due process rights.

69.     A basic Navajo Common Law is that one who is found responsible for inflicting harm on another person must pay the victim for the harm to restore harmony.

70.     Plaintiffs RJ, as outlined above, suffered harm at the hands of the named Defendants under Navajo Common Law and must be made whole by the Defendants in order to restore harmony in his life.

71.     Plaintiff MM, as outlined above suffered harm at the hands of the named Defendants under Navajo Common Law and must be made whole by the Defendants in order to restore harmony in her life.

## RELIEF REQUESTED, RESTORATION OF NAVAJO CULTURE, AND DAMAGES

72.     For approximately 50 years the LPP removed thousands of Navajo children from

17.     COMPLAINT FOR PERSONAL INJURY

the Navajo Nation and from their parents and other family members in an attempt to assimilate them into white Mormon culture. While this LPP may have been well-intentioned by Defendants because of their own religious and cultural reasons, the social and cultural harm to the Navajo Nation and its people must be addressed. In addition to the social injustice and harm occasioned by removing thousands of children from their parents, family and home, the culture of the Navajo Nation has been irreparably harmed by the Defendants' continuous and systematic assimilation efforts.

73.     Therefore, in an effort to apologize for harms caused and to show a desire to restore the Navajo culture that this program sought to remove from its participants, the Defendants should be ordered to:

a.     That within thirty (30) days after entry of Judgment, the LDS Defendants send letters of apology to Plaintiffs. Letters of apology will state that Plaintiffs were not at fault for the abuse and that Defendants take responsibility for the abuse.

b.     That the LDS Defendants write a letter of apology to the Navajo Nation Museum in Window Rock, Arizona, for harms caused to the people and culture by the LPP.

c.     That the LDS Defendants establish a task force that will work with the Navajo Nation Government in enhancing and restoring Navajo culture.

i.     That this task force design and implement a packet to be distributed at chapter houses explaining where individuals can seek help for the Navajo Tribe to restore harmony in their lives.

ii.     That the LDS Defendants fund this task force to implement programs(s) for individuals abused while participants in LLP that will restore harmony in their lives using both traditional Navajo healing methods and medical services; if needed.

WHEREFORE, Plaintiffs would also seek damages; costs; interest; the equitable relief described above and statutory/civil penalties according to law.

Plaintiffs pray for such other relief as the court deems appropriate and just.

18.     COMPLAINT FOR PERSONAL INJURY

DATED this 21st day of April, 2016

Respectfully submitted:

By: _____
    William R. Keeler
    KEELER & KEELER, LLP
    108 E. Aztec Ave.
    Gallup, NM  87301
    Phone:  (505) 722-5608
    Fax:  (505) 722-5614


## CERTIFICATE OF GOOD STANDING

Comes now the undersigned and hereby certifies to the Court that he is a member in good standing of the Navajo Nation Bar Association.

KEELER & KEELER, LLP

By: _____
    William R. Keeler

19.    COMPLAINT FOR PERSONAL INJURY